UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| *Plaintiff*, | ) | |
| | ) | |
| *vs.* | ) | 1:11-cr-00042-JMS-KPF |
| | ) | |
| TIMOTHY S. DURHAM, | ) | -01 |
| JAMES F. COCHRAN, and | ) | -02 |
| RICK D. SNOW, | ) | -03 |
| *Defendants.* | ) | |

# ORDER

Presently before the Court is Defendant Timothy S. Durham's Motion to Suppress Wiretap and Derivative Evidence for Lack of Necessity. [Dkt. 167.] Mr. Durham's co-Defendants, James F. Cochran and Rick D. Snow, have joined in the motion only insofar as it argues that "the affidavit submitted in support of the wiretap orders did not establish that ordinary law enforcement techniques had been tried and were unsuccessful or that ordinary law enforcement techniques would not have been sufficient to achieve law enforcement's legitimate investigative goals." [Dkt. 197. *See also* dkt. 186.]

## BACKGROUND

In the months leading up to November 2009, the Government was investigating an alleged Ponzi scheme that Mr. Durham and Mr. Cochran were operating through Fair Finance ("Fair"), and through various related entities in which Mr. Durham held an interest. On November 6, 2009, the Government submitted a forty-five page affidavit to the Court as part of its application for a wiretap on Mr. Durham's telephone. *See In re Application for Interception of*

*Wire Communications*, 1:09-mc-00179-SEB-DML [dkt. 1-1] (S.D. Ind.).[1]  FBI Special Agent Dennis Halliden, the case agent, signed the affidavit, a brief summary of which follows.

Special Agent Halliden averred that the FBI began its investigation in March 2009, with a proffer session of Daniel Laikin, a member of Fair Finance's board of directors. [Dkt. 169-1 ¶ 20.] "At the proffer session, Laikin advised investigators that Timothy Durham [was] running a Ponzi Scheme via Fair Finance." [*Id.*]

The affidavit then summarized the investigation that had ensued in the eight months following the proffer with Mr. Laikin.  The FBI contacted the Securities and Exchange Commission, who provided details about its ongoing civil investigation into Fair Finance, including those provided by a cooperating investor who said that he had invested money with Fair Finance that Fair Finance had been unable to repay when due. [*Id.* ¶ 21.]  The FBI interviewed Mr. Laikin's brother, who said, among other things, that "he fully expect[ed] to pick up the newspaper one morning and see … Durham … indicted for running a Ponzi scheme." [*Id.* ¶ 22.]  An undercover FBI agent contacted a Fair Finance affiliate pretending to want to invest with the company, and twice visited its Akron office for a sales meeting. [*Id.* ¶ 24-26.]  For approximately three months, beginning in September 2009, the FBI had been operating a pen register on Mr. Durham's phone. [*Id.* ¶ 27.]  The FBI reviewed public records and subpoenaed information from the Federal Reserve Bank in New York. [*Id.* ¶¶ 28, 30.]  Finally, the FBI had secured two confidential informants who were able to provide reliable information, but who had never personally discussed criminal activity with Mr. Durham. [*Id.* ¶¶ 35-36.]

---

[1] The affidavit has been filed in this case at Docket 169-1.  For ease of citation, the Court will use that citation going forward.  Additionally the Court notes that, in other pending motions, Mr. Durham disputes that the affidavit accurately describes what a Ponzi scheme is and maintains that Fair's financial operations were legitimate. [*See generally* dkt. 172.]  As the Defendants have not advanced developed argument on those points in this motion, the Court will not address them here.

Special Agent Halliden then explained why he believed that a wiretap was necessary to complete the investigation. The FBI had no leads for confidential informants who were directly involved in criminal activity with Mr. Durham. [*Id.* ¶ 38.] Given Mr. Durham's level of sophistication, the FBI could likely not send an undercover agent into the operation to directly participate in criminal activity with Mr. Durham in any reasonable amount of time. [*Id.* ¶ 41.] A grand jury investigation or a search warrant would cause a run on Fair Finance. [*Id.* ¶¶ 44-45.] If Fair Finance were merely undercapitalized, as opposed to being a Ponzi scheme, then the run on Fair Finance would cause it to needlessly collapse; further time might let Fair Finance achieve higher capitalization. [*Id.* ¶ 45.] But if a Ponzi scheme existed, Special Agent Halliden believed that the Government would be able to recover more for victims if the Government could speed up its investigation via a wiretap. [*Id.*] With respect to pen registers, the FBI had already been using them, but they only provide evidence that calls have taken place; the Government needed access to the contents of the calls to gain insight into the true nature of Fair Finance. [*Id.* ¶ 51.] Finally, physical surveillance would likewise only show that face-to-face meetings had occurred, but would provide no insight into their content. [*Id.* ¶ 52.]

The Court granted the wiretap application. *In re Application for Interception of Wire Communications*, 1:09-mc-00179-SEB-DML [dkt. 2] (S.D. Ind.).

In connection with several motions that he filed, including this one, the Court afforded Mr. Durham an evidentiary hearing. [*See* dkt. 262.] At that hearing, Special Agent Halliden testified. Mr. Durham was also permitted to file a deposition of Mr. Laikin[2] in lieu of having him

---

[2] The portion of Mr. Laikin's deposition that was filed did not contain information that contradicted the content of the Halliden affidavit. Special Agent Halliden did agree in his testimony that Mr. Laikin never used the term Ponzi scheme in describing his knowledge of Fair's financial circumstances. Special Agent Halliden clarified that it was Mr. Laikin's lawyer who used the term in describing the substance of the potential proffer.

testify live. [*See* dkt. 261-1.] To the extent that Mr. Durham sought to attack the veracity of Special Agent Halliden's affidavit, summarized above, the Court finds that those attacks were unfounded; therefore, the Court accepts the affidavit at face value and as submitted in good faith, and the Court will proceed to the analysis on that basis.[3]

## DISCUSSION

When Congress enacted Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510-2520, it created "a comprehensive scheme for the regulation of wiretapping and electronic surveillance." *Gelbard v. United States*, 408 U.S. 41, 46 (1972) (citation omitted). In Title III, Congress decided to impose a necessity requirement on the Government before it can obtain a wiretap: The Government must establish, through a "full and complete" statement, that non-wiretap investigative procedures "have been tried and have failed or reasonably appear to be unlikely to succeed if tried or [are] too dangerous." 18 U.S.C. § 2518(3)(c). Through the present motion, Mr. Durham argues that the Government's wiretap application failed to make a satisfactory showing of necessity for the wiretap and, consequently, that the Court should suppress the evidence that the wiretap uncovered (as well as any derivative evidence), *see id.* § 2515 (providing for suppression of evidence obtained in violation of Title III).

The necessity requirement in Title III serves a narrow purpose. Congress wanted "to ensure not that wiretaps are used only as a last resort in an investigation, but that they were not to be routinely employed as the initial step in criminal investigation." *United States v. Thompson*, 944 F.2d 1331, 1340 (7th Cir. 1991) (quotation omitted). Thus, the Seventh Circuit has long held that the necessity hurdle "is not great," and necessity claims must be viewed "in a practical and commonsense fashion." *United States v. Anderson*, 542 F.2d 428, 431 (7th Cir. 1976); *ac-*

---

[3] With respect to his claim that the Government engaged in wiretapping before receiving Court authorization to do so, the Court has rejected that claim by separate opinion. [*See* dkt. 281.]

*cord United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006). Indeed, the Government can establish necessity even without actually trying other investigative measures. *United States v. Zambrana*, 841 F.2d 1320, 1329 (7th Cir. 1988) ("[T]he statute does not require that other investigative procedures actually be implemented before an order may be issued for the interception of wire communications…."). And it can establish necessity for a wiretap even when an indictment and even a full prosecution are at least theoretically possible based upon information it already possesses. *See United States v. McLee*, 436 F.3d 751, 763 (7th Cir. 2006) ("To receive a wiretap order, the government need not demonstrate that prosecution would be impossible without it or that evidence possibly sufficient for indictment could not conceivably be obtained through other means."). "Necessity," therefore, constitutes an elastic concept.

Although Mr. Durham claims that the Government stretched the concept of necessity to its breaking point by failing to "make a good faith effort to explore the viability of traditional techniques," [dkt. 239 at 1], the affidavit that the Government submitted to support the wiretap application establishes otherwise. The Government actively investigated the case for eight months—through a variety of traditional means. Accordingly, the Court finds no basis to conclude that the Government sought to impermissibly use the wiretap as a "routine[] … initial step in criminal investigation." *Thompson*, 944 F.2d at 1340 (quotation omitted).

To the extent that Mr. Durham argues that the Government was specifically required to first attempt to arrange to have an undercover agent meet with Mr. Durham by pretending to be interested in investing a large amount of cash or to coordinate its investigation with federal and state securities officials, the Court rejects those claims, too. The Seventh Circuit is clear that actual exhaustion of traditional means is not required. *Id.* Furthermore, the Government's concerns about maximizing potential victim recovery and needlessly bringing down Fair Finance if

it were merely undercapitalized provide "practical and commonsense" reasons for obtaining a wiretap, which afforded a covert and speedy way to resolve the leads that traditional techniques had already turned up. *Anderson*, 542 F.2d at 431. And even if Mr. Durham were correct that the Government overestimated the risk of a run (even though the Court rejects that claim as a factual matter and even though he, elsewhere, acknowledges the "short-term cash flow/liquidity issues" that Fair Finance was having, [dkt. 199]), Mr. Durham offers no support from the Seventh Circuit about why the concededly "very low" bar, [dkt. 239 at 1], that "necessity" imposes required the public to assume that risk.

Finally, the Court notes that between his opening and reply briefs, Mr. Durham changed tacks about the implications of the "full and complete" statement required under Title III, 18 U.S.C. § 2518(3)(c). His opening brief argued that the Government's statement failed to include all relevant information, by attempting to catalogue possible investigatory steps that the Government did not disclose that it had not yet apparently taken. [*See* dkt. 168 at 3.][4] His reply, however, essentially argues that the failure to undertake those steps shows a lack of necessity. [*See* dkt. 239 at 2-3.] As for the former, the Court does not find any omissions material; the Government's affidavit explained what the Government actually did and why it was not enough to wrap up the investigation. That is all that is required. *See United States v. Zambrana*, 841 F.2d 1320, 1330 (7th Cir. 1988) ("In this circuit, we will affirm a district court's finding that normal investigative procedures were unlikely to be successful . . . as long as there existed a factual predicate in the affidavit." (quotation omitted)). As for the latter, the Court has already ex-

---

[4] He also mentioned "misrepresentations." [*Id.*] But as indicated in above, *see supra n.* 2, the Court has rejected factual challenges to the veracity of the affidavit as inconsistent with the evidence presented at the hearing.

plained above why the Government was not required to follow Mr. Durham's alternative proposed investigative strategy.

## CONCLUSION

Mr. Durham's Motion to Suppress Wiretap and Derivative Evidence for Lack of Necessity, [dkt. 167], joined in part by Mr. Snow and Mr. Cochran, is **DENIED**.

04/26/2012

_____
Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only:**

Jan M. Carroll
BARNES & THORNBURG LLP
jan.carroll@btlaw.com

Henry Van Dyck
U.S. DEPARTMENT OF JUSTICE
Henry.Van.Dyck@usdoj.gov

Winfield D. Ong
UNITED STATES ATTORNEY'S OFFICE
winfield.ong@usdoj.gov

Robertson Park
U.S. DEPARTMENT OF JUSTICE
Robertson.Park@usdoj.gov

Nicholas E. Surmacz
UNITED STATES ATTORNEY'S OFFICE
nicholas.surmacz@usdoj.gov

John L. Tompkins
BROWN TOMPKINS LORY & MASTRIAN
johnltom@mac.com

Henry Parker Van Dyck
UNITED STATE DEPARTMENT OF JUSTICE
henry.van.dyck@usdoj.gov

Joe Howard Vaughn

UNITED STATES ATTORNEY'S OFFICE
joe.vaughn@usdoj.gov

William H. Dazey , Jr.
INDIANA FEDERAL COMMUNITY DEFENDERS
bill.dazey@fd.org

Jeffrey Allen Baldwin
VOYLES ZAHN PAUL HOGAN & MERRIMAN
jbaldwin@vzplaw.com